**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**LAKE CHARLES DIVISION**

| | |
|---|---|
| **RICKY FOREMAN, AMY NICOLE STEWART, and ERIC FOREMAN** *Plaintiffs,* **VERSUS** **THE PROCTER & GAMBLE COMPANY** **Defendant** | **CIVIL ACTION NO. 2:23-CV-00076** **JUDGE:  JAMES D. CAIN, JR.** **MAGISTRATE: KATHLEEN KAY** |

<u>**SECOND AMENDED COMPLAINT AND DEMAND FOR TRIAL BY JURY**</u>

Plaintiffs Ricky Foreman, Amy Nicole Stewart, and Eric Foreman ("Plaintiffs"), respectfully file their Second Supplemental and Amended Complaint representing the following survival actions and wrongful death actions for the untimely loss of their wife and mother, respectively, Arlene Foreman, due to the actions of Defendant, The Procter & Gamble Company.

<u>**PARTIES**</u>

**1.**

At all times herein, Ricky Foreman and Arlene Foreman are/were persons of the full age of majority domiciled in Calcasieu Parish, State of Louisiana.  Amy Foreman Stewart is a person of the full age of majority domiciled in Calcasieu Parish, State of Louisiana. Eric Foreman is a person of the full age of majority domiciled in Plaquemines Parish, State of Louisiana.

**2.**

Made Defendant is **THE PROCTER & GAMBLE COMPANY (hereinafter referred to as P&G),** an Ohio corporation with its headquarters at 1 P&G Plaza, Cincinnati Ohio 45202.

**3.**

Defendant P&G manufactures and distributes its products, including multiple anti-perspirant products, throughout Louisiana.  P&G does, and regularly has, conducted business in every Parish in the State of Louisiana, including Calcasieu Parish.

## JURISDICTION AND VENUE

**4.**

This Court has jurisdiction over this matter because there is diversity jurisdiction since Plaintiffs and Defendant are citizens of different States and the aggregate amount in controversy exceeds $75,000, exclusive of interest and costs.  This Court has specific personal jurisdiction over Defendant because they have substantial aggregate contacts with this District including advertising, marketing, and distributing with intent that its Secret Powder Fresh 24 HR Aerosol products are sold and purchased throughout the state of Louisiana, engaging in conduct in this District that has a direct substantial reasonably foreseeable and intended effect of causing injury to persons in Louisiana, and because Defendant purposely availed themselves of doing business in the state of Louisiana.

**5.**

In accordance with 28 U.S.C. § 1332, venue is proper in this District because a substantial part of the conduct giving rise to Plaintiffs' claims occurred in this District, Defendant transacts business in this District, and Defendant has intentionally availed themselves of the laws and markets within this District.

## FACTUAL ALLEGATIONS

**6.**

The secret brand was created by P&G in or around 1958 as a personal care brand for women.  All secret brand products are, and always have since 1958, been manufactured, marketed, sold and distributed by P&G, including in the State of Louisiana.

**7.**

In 1964, secret aerosol was introduced into the market by P&G.

**8.**

In the 1980s, Secret Powder Fresh aerosol was introduced into the market by P&G.

**9.**

On November 4, 2021, an independent testing laboratory (Valisure, LLC) announced the detection of high levels of benzene, a known human carcinogen, in several brands and batches of antiperspirant body sprays produced, manufactured and sold by P&G, including those specific sprays used by Plaintiff, Arlene Foreman.

**10.**

Valisure, LLC tested three batches of P&G's Secret Powder Fresh 24 HR Aerosol antiperspirant spray, which included UPC numbers 037000711087 and 037000711094, and three different lot numbers from those UPC numbers, 11721458SG, 11701458SH, and 12181458SD.

**11.**

Additionally, one of those three batches was then tested by a secondary source, the Chemical and Biophysical Instrumentation Center at Yale University (UPC Number 037000711087 with lot number 11721458SG).

3

**12.**

Both Valisure, LLC and the Chemical and Biophysical Instrumentation Center at Yale University found excessively high amounts of Benzene within P&G's Secret Powder Fresh 24 HR Aerosol antiperspirant spray.

**13.**

David Y. Light, the CEO and co-founder of Valisure LLC, clarified through the attached affidavit that all tested samples of Secret Powder Fresh 24 HR Aerosol antiperspirant spray tested by Valisure contained excessively high amounts of benzene.[1]

**14.**

At some undisclosed point in time following the issuance of the Valisure report, an internal review of Secret aerosol spray products was initiated for the presence of benzene by P&G. Based on that review, the company announced a recall based on the presence of benzene in eight separate aerosol deodorant products.  P&G voluntarily recalled certain sprays in two separate instances in late November of 2021 and December of 2021.[2]

**15.**

In its recall announcement, however, it was not disclosed how many products P&G tested, nor what levels of benzene were detected in the eight separate aerosol deodorant products.

**16.**

P&G's voluntary recall included all batches and lot numbers of Secret Aerosol Powder Fresh 24 HR Aerosol with UPC numbers 037000711087 (6 oz.) and 037000711094 (4 oz.), which are the same UPC numbers as those identified in the Valisure Citizen's Complaint to the FDA.

**17.**

---

[1] See **Exhibit A**, affidavit of David Y. Light
[2] https://secret.com/en-us/aerosol-recall

Secret Powder Fresh 24 HR Aerosol products' inactive ingredients are: _isobutane_, hydrofluorocarbon 152A, cyclopentasiloxane, isopropyl myristate, dimethicone, disteardimonium hectorite, propylene carbonate, and fragrance.

## 18.

Included in P&G's "Aerosol Spray Antiperspirant Voluntary Recall Statement", P&G admitted "Benzene is classified as a human carcinogen, a substance that could potentially cause cancer depending on the level and extent of exposure."

## 19.

On February 2, 2021, Arlene Foreman was diagnosed with a rare form of blood cancer called multiple myeloma.

## 20.

Arlene Foreman died from multiple myeloma on February 13, 2022.

## 21.

For many years prior to Arlene Foreman's diagnosis and death, Arlene Foreman was a regular user of products produced, manufactured and sold nationwide by Defendant, P&G, including, but not limited to, P&G's signature antiperspirant, "Secret Powder Fresh 24 HR Aerosol" spray.

## 22.

As part of Arlene Foreman's regular use of these products since the 1980s, she would apply the aforementioned aerosol antiperspirant multiple times per day, each and every day.

**23.**

Arlene Foreman regularly used the sprays in small, enclosed, non-ventilated spaces, causing Arlene Foreman to regularly inhale large quantities of these aerosol products.

**24.**

Additionally, the antiperspirant spray would be administered to Arlene Foreman's underarms immediately subsequent to her use of razor blades to her underarm and armpit areas. Therefore, the benzene contaminated product would regularly enter Arlene Foreman's blood stream through these small cuts and abrasions on a daily basis over the course of many years.

**25.**

The aforementioned sprays were distributed, marketed and sold to Arlene Foreman in Calcasieu Parish, Louisiana.

**26.**

The aforementioned sprays were bought and used by Arlene Foreman in Calcasieu Parish, Louisiana.

**27.**

Ricky Foreman retained possession of two cans of P&G's Secret Powder Fresh 24 HR Aerosol antiperspirant spray which had been used by Arlene Foreman prior to her diagnosis of multiple myeloma and untimely death.

**28.**

The two cans of Secret Powder Fresh 24 HR Aerosol antiperspirant spray both identify UPC code 037000711087, with respective lot numbers 12341458SB and 11441458SQ.[3]

---

[3] See **Exhibit B**, Photographs of the two bottles retained by Ricky Foreman with UPC code 037000711087, with respective lot numbers 12341458SB and 11441458SQ.

**29.**

The two cans of Secret Powder Fresh 24 HR Aerosol antiperspirant spray with UPC number 037000711087 and lot numbers 12341458SB and 11441458SQ were tested for the presence and levels of benzene by Valisure at Plaintiffs' request on January 15, 2024.

**30.**

The testing of the two cans of Secret Powder Fresh 24 HR Aerosol antiperspirant spray with UPC code 037000711087, and respective lot numbers 12341458SB and 11441458SQ, revealed an average result of approximately 4.69 ppm of benzene in lot number 12341458SB, and 8.24 ppm of benzene in lot number 11441458SQ.[4]

**31.**

Since it was first manufactured and placed on the market in the 1980's, Secret Powder Fresh Aerosol has used isobutane as an ingredient.

**32.**

The Benzene which is found in P&G's Secret Powder Fresh 24 HR Aerosol antiperspirant spray is caused by the use of the ingredients contained in the propellant of the spray, specifically isobutane.[5]

**33.**

The use of contaminated aerosol products, such as those tested by Valisure, in small, enclosed spaces such as bathrooms would increase the level of benzene in the breathable air anywhere from 13 times to 60 times the EPA-estimated threshold for increased cancer risk.[6]

---

[4] See **Exhibit C**, Valisure Report 24-017-001
[5] See **Exhibit A**, Affidavit of David Light, paragraph 21, pgs. 3-4
[6] Id., paragraph 24, pgs. 4-5

**34.**

Each and every bottle of P&G's Secret Powder Fresh 24 HR Aerosol antiperspirant spray included excessively high amounts of the human carcinogen, Benzene, since it was first placed on the market in the 1980's due to the use of isobutane as an ingredient.

**35.**

Therefore, Plaintiffs allege based on information and belief that P&G's Secret Powder Fresh 24 HR Aerosol antiperspirant spray has always contained dangerous levels of Benzene, in every batch which has ever been produced by P&G since the product was first placed on the market in the 1980's.

**36**.

Benzene is not a listed active or inactive ingredient in any of the products produced, manufactured and sold nationwide by P&G and listed in the Valisure FDA Citizen's Petition.

**37.**

None of the products listed by Valisure, LLC, including the aerosol antiperspirant regularly used by Arlene Foreman for many years, included any warnings or other labels notifying users of these products that the products contained benzene, and/or warned of the health effects and/or dangers posed by exposure to benzene.

**38.**

Deodorant is a product applied to the body to prevent or mask the odor of perspiration. Antiperspirants, a subclass of deodorants, prevent sweat glands from producing sweat. The product referred to in this Complaint is both deodorant and antiperspirant applied to the body as a spray.

**39.**

The U.S. Food and Drug Administration ("FDA") classifies and regulates most deodorants, including the product complained of herein, as cosmetics. In addition, the FDA classifies and regulates antiperspirants, including the product complained of herein, as a drug.

**40.**

Defendant knew, or reasonably should have known, of the Product's benzene contamination well before the recall of these products.  Defendant was required to subject the products to rigorous quality assurance by Defendant's internal guidelines and applicable laws and regulations.  *See* 21 CFR 211.84 (a) Each lot of components, drug product containers, and closures shall be withheld from use until the lot has been sampled, tested, or examined, as appropriate, and released for use by the quality control unit. (b.) Representative samples of each shipment of each lot shall be collected for testing or examination. Despite Defendant's knowledge of the pervasive risk of benzene contamination in the products, defendant failed to warn consumers of this known danger until the recall notice.

## DANGER POSED BY THE PRODUCT

**41.**

Benzene is a known human carcinogen which causes cancer in humans.

**42.**

Benzene is classified as a "Class 1" solvent that should be avoided by humans.

**43.**

There is no amount of acceptable benzene in aerosol sprays, such as the products listed herein and in the Valisure Citizens Complaint.

**44.**

The development of multiple myeloma as a result of benzene exposure has been well documented, and death resulting from multiple myeloma has been associated with benzene exposure.

**45.**

The Food and Drug Administration ("FDA") similarly recognizes that benzene is a carcinogen that can cause cancer in humans. That "In small amounts over long periods of time, benzene can decrease the formation of blood cells. Long term exposure to benzene through inhalation, oral intake, and skin absorption may result in cancers such as leukemia and other blood disorders."[7]

**46.**

The International Myeloma Foundation has found:

> Another example is benzene, one of the 20 most widely used chemicals in this country. Studies linking benzene to myeloma go back to 1897. Two recent meta-analyses, in 2015 and in 2011, have confirmed the association of benzene exposure with the development of myeloma. The 1965 Bradford Hill criteria, established by British scientist Sir Bradford Hill, are used to make the connection between benzene and myeloma. This approach has been endorsed by the Occupational Safety and Health Administration (OSHA), the National Toxicology Program (NTP), and the National Cancer Institute (NCI) President's Panel in the U.S, and by the International Agency for Research on Cancer (IARC) in France. Other countries have researched and published data on the topic as well. The Occupational Diseases Medical Advisory Board in Germany published a study showing a connection between benzene exposure and myeloma in 2009. South Korean studies appeared in 2014 and 2015.[8]

---

[7] https://www.fda.gov/drugs/drug-safety-and-availability/frequently-asked-questions-benzene-contamination-drugs
[8] https://imf-d8-prod.s3.us-west-1.wasabisys.com/2021-05/VAM-MYELOMA-AND-MILITARY-SERVICE-INFO-BOOK-APRIL-2020v10.pdf

**47.**

The American Cancer Society notes that the International Agency for Research on Cancer ("IARC"), which is part of the World Health Organization ("WHO") classifies benzene as a carcinogen to humans and that benzene exposure has been linked with multiple myeloma.[9]

**48.**

Multiple studies have correlated low levels of daily benzene exposure (exposure levels far lower than those experienced by Arlene Foreman from P&G's tainted products) to increased risk of contracting multiple myeloma, including, but not limited to:

a.   Goldstein BD. *Is exposure to benzene a cause of human multiple myeloma?* Ann NY Acad Sci 609:225-230 (1990);

b.   Jorunn Kirkeleit et al., *Increased Risk of Acute Myelogenous Leukemia and Multiple Myeloma in a Historical Cohort of Upstream Petroleum Workers Exposed to Crude Oil*, 19 Cancer Causes Control 13 (2008).

c.   Infante, P.F. *Benzene exposure and multiple myeloma: A detailed meta-analysis of benzene cohort studies.* Ann. N. Y. Acad. Sci. 2006, 1076, 90–109;

d.   Stenehjem JS, Kjærheim K, Bråtveit M, Samuelsen SO, Barone-Adesi F, Rothman N, Lan Q, Grimsrud TK. *Benzene exposure and risk of lymphohematopoietic cancers in 25 000 offshore oil industry workers.* Br J Cancer. 2015 Apr 28;112(9):1603-12; and

e.   Onyije, F.M.; Hosseini, B.; Togawa, K.; Schüz, J.; Olsson, A. *Cancer Incidence and Mortality among Petroleum Industry Workers and Residents Living in Oil*

---

[9] https://www.cancer.org/cancer/risk-prevention/chemicals/benzene.html

*Producing Communities: A Systematic Review and Meta-Analysis.* Int. J. Environ. Res. Public Health 2021, 18, 4343.

**49.**

The FDA classifies benzene as a Class 1 solvent that should be avoided. According to FDA guidance: Solvents in Class 1 should not be employed in the manufacture of drug substances, excipients, and drug products, because of their unacceptable toxicity or their deleterious environmental effect.

**50.**

FDA's guidance for industry Q3C provides that: "Solvents in Class 1 (i.e. benzene) should not be employed in the manufacture of drug substances, excipients, and drug products because of their unacceptable toxicity or their deleterious environmental effect." That provision provides in full:

> III. SOLVENTS GROUPED BY CLASS Solvents in Class 1 (i.e. benzene) should not be employed in the manufacture of drug substances, excipients, and drug products because of their unacceptable toxicity or their deleterious environmental effect. However, if their use is unavoidable in order to produce a drug product with a significant therapeutic advance, then their levels should be restricted… [to 2 ppm], unless otherwise justified.

**51.**

Thus, although benzene should not be employed in the manufacture of drug products, it may be used in some drug products when (1) its use is unavoidable to produce a drug product with (2) "significant therapeutic advance."  Defendant's products do not meet this exception. This is because the use of benzene in the manufacture of the products is not "unavoidable", nor does the use of benzene in the product provide a "significant therapeutic advance."

**52.**

The Valisure testing shows that the use of benzene is entirely avoidable in these types of products, as the Valisure report showed a variation of benzene contamination in the batches of body spray products (i.e. antiperspirant and deodorant) tested.  Valisure's testing showed some products did not detect benzene at all and other products with benzene were under 2.0 ppm.

**53.**

Defendant's antiperspirant deodorant Products are drugs which are adulterated under 21 U.S.C. § 351(a)(1) based upon the presence of benzene.

**54.**

Defendant's antiperspirant deodorant Products are drugs which are misbranded under 21 U.S.C. § 352 (a) based upon the presence of benzene.

**55.**

The Federal Food, Drug, and Cosmetic Act ("FDCA") prohibits "[t]he introduction or delivery for introduction into interstate commerce of any food, drug, or cosmetic that is adulterated or misbranded." 21 U.S.C. § 331(a), 21 U.S.C. § 352(a).

**56.**

As alleged herein, Defendant has violated the FDCA and consumer protection statutes.

**57.**

Defendant engaged in fraudulent, unfair, deceptive, false, misleading, and/or unlawful conduct stemming from their omissions surrounding benzene contamination affecting the Products.  No reasonable consumer, including Plaintiffs, would have purchased the Products had they known of the material omissions of material facts regarding the presence of benzene. Accordingly, Plaintiffs suffered injury in fact and lost money as a result of Defendant's misleading

representations and omissions and did not receive the benefit-of-the-bargain.

**58.**

Arlene Foreman contracted multiple myeloma secondary to her chronic, consistent exposure to unusually high levels of benzene contained in the products produced, manufactured and sold to her by defendant, P&G.

**59.**

Arlene Foreman unknowingly was exposed to large quantities of benzene over a significantly long time period through inhalation of the benzene laced products, benzene entering her blood stream through small cuts and nicks in her skin following shaving, and through her eyes and mouth.

**60.**

At the time of her diagnosis and death, Arlene Foreman was legally married to her husband, Ricky Foreman.

**61.**

At the time of her death, Arlene Foreman had two adult biological children, Amy Nicole Stewart and Eric Foreman.

**62.**

Ricky Foreman is the surviving spouse and an heir of Arlene Foreman.

**63.**

Amy Nicole Stewart and Eric Foreman are the surviving children and heirs of Arlene Foreman.

**64.**

Pursuant to LA. C.C. art. 2315.2(A)(1), Ricky Foreman, as the surviving spouse and heir of the deceased, Arlene Foreman, is entitled to, and does hereby assert a claim for the damages he has sustained as a result of the wrongful death of Arlene Foreman, which include, but are not limited to:

    a. Past emotional pain and suffering from the death and loss of his wife;

    b. Future emotional pain and suffering from the death and loss of his wife;

    c. Past medical expenses;

    d. Expenses sustained as a result of the untimely death of his wife; and

    e. The loss of love, affection, companionship and society from his deceased wife.

**65.**

Pursuant to LA. C.C. art. 2315.2(A)(1), Amy Nicole Stewart, as one of the surviving children and heir of the deceased, Arlene Foreman, is entitled to, and does hereby assert a claim for the damages she has sustained as a result of the wrongful death of Arlene Foreman, which include, but are not limited to:

    a) Past emotional pain and suffering from the death and loss of her mother;

    b) Future emotional pain and suffering form the death and loss of her mother;

    c) Expenses sustained as a result of the untimely death of her mother; and

    d) The loss of love, affection, companionship and society from her deceased mother.

**66.**

Pursuant to LA. C.C. art. 2315.2(A)(1), Eric Foreman, as one of the surviving children and heir of the deceased, Arlene Foreman, is entitled to, and does hereby assert a claim for the damages

he has sustained as a result of the wrongful death of Arlene Foreman, which include, but are not limited to:

    a) Past emotional pain and suffering from the death and loss of his mother;

    b) Future emotional pain and suffering form the death and loss of his mother;

    c) Expenses sustained as a result of the untimely death of his mother; and

    d) The loss of love, affection, companionship and society from his deceased mother.

**67.**

Ricky Foreman, Amy Nicole Stewart and Eric Foreman are the proper parties to bring the survival action pursuant to La. C.C. art. 2315.1(A)(1).

**68.**

Arlene Foreman suffered the following severe physical and emotional injuries as a direct result of Defendant, P&G's, actions:

    a. Mental anguish, including, including but not limited to, fear, anxiety, worry, stress and depression;

    b. Physical Pain and suffering;

    c. Loss of enjoyment of life;

    d. Past medical expenses;

    e. Untimely death; and

    f. Any and all other damages not specifically listed herein.

**69.**

The defendant, P&G, knew or reasonably should have known that the products manufactured, produced, marketed and sold to Arlene Foreman contained the known human carcinogen, benzene.

**70.**

The Defendant, P&G, should have ensured the products it produced, manufactured, marketed, and sold in Louisiana, and specifically to Arlene Foreman, were free of known human carcinogens, including benzene.

**71.**

Additionally, the Defendant, P&G, should have ensured the products it produced, manufactured, marketed, and sold in Louisiana, included warning labels notifying consumers of these products that the products contained the known human carcinogen, benzene.

**72.**

At the time these products were produced, manufactured, marketed, and sold in Louisiana, and specifically to Arlene Foreman, P&G was aware, and/or should reasonably have been aware of the relationship between exposure to benzene and cancer-related illnesses, including multiple myeloma.

**73.**

Therefore, P&G breached its duties, which were owed to Arlene Foreman, Ricky Foreman, Amy Nicole Stewart and Eric Stewart, in the following ways:

a. Failure to design the products to contain available and suitable components other than benzene;

b. To sell benzene-free products;

c. To select materials other than benzene for inclusion into their products;

d. To fully test their respective products for health risks associated with the normal and intended use of their products;

e.  To fully inspect and test their respective products for health risks and the presence of carcinogens and/or other chemicals which may be present in their products prior to marketing and sale of said products;

f.  To properly identify the chemicals included in their product and warn its consumers of its products of the hazards associated with the products' use;

g.  To refrain from negligently misrepresenting the ingredients of the products it manufactured and sold;

h.  To refrain from negligently misrepresenting the safety and health risks of the products it sold;

i.  To properly inquire about or investigate the safety and health risks of the products it sold;

j.  To research, study and be aware of the medical and scientific studies concerning the health risks of benzene;

k.  To warn the consumers of its products of the presence of benzene in said products;

l.  To provide an alternative design of the product which did not include benzene;

m.  To warn consumers of its products of the dangers associated to exposure to chemicals contained within its products; and

n.  Any and all other acts which may be revealed at the trial of this matter.

## **PLAINTIFFS' CLAIMS UNDER THE LPLA**

**74.**

Under the Louisiana Products Liability Act (the "LPLA"), P&G, as the manufacturer of the products sold to and used by Arlene Foreman, is responsible for all injuries and damages

associated with the sale of the benzene laced products to Arlene Foreman for the following reasons:

    a.  The products sold to Arlene Foreman were unreasonably dangerous as they were defective in construction or composition; the products were defectively designed; the products failed to provide an adequate warning; and the products did not conform to any express warranty of the manufacturer.

    b.  The inclusion of benzene in the aforementioned product existed at the time the products left control of P&G.

### A.  The Product Was Unreasonably Dangerous in Construction or Composition.

**75.**

The design specifications of the product specifically exclude the use of Benzene as either an active or inactive ingredient.

**76.**

Defendant employs a four-step process to ensure the safety of its products.[10]

**77.**

The four-step process employed by Defendant is: 1) Doubt, 2) Define, 3) Determine, and 4) (perform) Diligence.[11]

**78.**

Defendant admits it employs a rigorous safety process which analyzes *every* ingredient in all of its products sold to the public, which would include all active and inactive ingredients.[12]

---

[10] https://us.pg.com/product-safety/
[11] Id.
[12] Id.

**79.**

In order to comply with its own internal safety guidelines and procedures, Defendant evaluates all ingredients used in its products to ensure they are safe for both the consumer and the environment.[13]

**80.**

Given Defendant's own admitted standards and testing procedures, Defendant either knew and/or reasonably should have known through its own internal testing procedures that the product included a known human carcinogen, benzene, which was present in the product at the time it left its care, custody, and control and entered the marketplace.

**81.**

Defendant has admitted through its recall of the product at issue that the product failed to conform to its own specifications and performance standards due to the presence of benzene in the product.

**82.**

Furthermore, the specific product used by Arlene Foreman which caused her untimely death deviated in a material way from Defendant's specifications and performance standards as those products contained benzene.

**83.**

The actual product Arlene Foreman used, identified as UPC code 037000711087, is one that was recalled by P&G, and is the same UPC code identified in Valisure's citizen's complaint to the FDA. furthermore, the actual product Arlene Foreman used was tested by Valisure and

---

[13] https://us.pg.com/product-safety/

shown to have unacceptable toxicity levels of benzene, which proximately caused Arlene Foreman's injuries and damages.

**B.  The Product Was Unreasonably Dangerous in Design.**

**84.**

Defendant developed, designed, manufactured, controlled, distributed, sold, and/or supplied the product which Plaintiff, Arlene Foreman, used and was exposed to.

**85.**

The product was expected to, and did in fact reach users, such as Arlene Foreman, without substantial change in the condition in which it was created, designed, manufactured, distributed, sold and/or supplied.

**86.**

At all relevant times, the product was used for the purpose for which it was designed and manufactured – to prevent or mask body odor and/or reduce sweating.  It was used in a foreseeable manner by an ordinary consumer who possesses ordinary common knowledge for whom the product was intended. There was no misuse involved.

**87.**

The product was defectively designed in that (1) its risks outweighed its utility, and (2) safer, feasible alternative designs are and were at all times available.

**88.**

Safer alternative designs existed. Such safer alternative designs include not utilizing the propellant that sprays the product out of the can that exposed Plaintiff, Arlene Foreman, to benzene. Defendant could have used alternative designs instead of the propellant. Specifically, one such alternative design that was available is bag-on-valve technology that separates the product

inside the can. Upon information and belief, additional alternative designs were available.

**89.**

The risk of the benzene contaminated product outweighed its benefits.  Specifically, the benefit of the product is to prevent or mask body odor and/or reduce sweating.  This benefit is significantly outweighed by the risks posed by the product – the risks of developing cancer (multiple myeloma) and possibly death.

**90.**

Arlene Foreman had many other alternatives available to her, including other aerosol deodorants and antiperspirants that did not have benzene contamination.  These other aerosol deodorants and antiperspirants that did not contain benzene met the same needs of preventing, masking body odor and/or reduce sweating and were not unsafe to use.  No reasonable consumer would select from other alternatives available, the one that exposes her to benzene and causes cancer.

**91.**

The product was defective, unreasonably dangerous and unsafe for its intended purpose because when exposed to benzene by inhalation, orally, and through the skin, it can result in cancers including blood cancer of the bone marrow and blood disorders which can be life threatening, such as multiple myeloma.

**92.**

Defendant additionally had the ability to eliminate the unsafe character of the product without impairing its usefulness.  By choosing not to use the propellant involved and using an alternative, economically feasible, design, such as bag-on-valve technology, Defendant could have eliminated the benzene contamination without impairing the antiperspirant deodorant's usefulness.

**93.**

The gravity of the damage that the unreasonably dangerous product design caused, allowing benzene contamination - which proximately causes cancers, including multiple myeloma and blood cancer of the bone marrow, as well as blood disorders that are life-threatening and can result in death - far outweighs the burden of adopting the alternative product design, including, but not limited to, a bag-on-valve technology.

**94.**

The deodorant product's design defects existed at the time it left Defendant's possession and control.

**95.**

Arlene Foreman used the product in an intended and reasonably foreseeable manner without knowledge of its dangerous characteristics.  There was no misuse involved, Arlene Foreman applied the product to her underarms and sprayed the product as the product and Defendant instructed.

**96.**

Arlene Foreman could not have reasonably discovered the defect and risks associated with the product before or at the time of use.  The product's defect of containing benzene was not self-evident or obvious for an ordinary average user like Arlene Foreman – by simply looking at the product there was no way for her to know it was contaminated with benzene as there is no mention of benzene listed in the ingredient list on the product's label, nor were there are any warnings of benzene contained in the Warnings section on the product's label.

**97.**

The benzene defect in the product that Arlene Freman used for over thirty years was a

substantial and contributing factor in proximately causing her injuries, cancer and death, and all Plaintiffs' injuries, losses and damages.

**98.**

Had Arlene Foreman known of the benzene defect in the product, she would not have used it.  Instead, Mrs. Foreman would have used available safer alternative aerosol antiperspirant deodorants that would not have exposed her to benzene and her development of cancer.

**99.**

Plaintiffs' injuries, harms, losses and damages were directly and proximately caused by the deodorant products' benzene contamination defect that Plaintiff used in a reasonably foreseeable manner for which recovery is sought.

**C.   The Product Was Unreasonably Dangerous Due to a Failure to Warn Consumers.**

**100.**

At all times relevant, Defendant had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain, supply, provide proper warnings and take steps as necessary to ensure the product did not cause users and consumers to suffer from unreasonable and dangerous risks like benzene exposure.

**101.**

At all times relevant, Defendant had a continuing duty to warn users, such as Arlene Foreman, of the dangers associated with the product's use.  This duty to warn Arlene Foreman is a result of Defendant's direct to consumer advertising.

**102.**

At all times relevant, Defendant could have provided adequate warnings or instructions regarding the risks of benzene because Defendant knew or should have known of the unreasonable

risks of harm associated with the use of the product.

**103.**

At all times relevant, Defendant failed to investigate, study, test or advise of the benzene dangers to users and consumers of the product, including Arlene Foreman.

**104.**

Despite the fact that Defendant knew or should have known that the benzene in the product posed a grave risk of harm, they failed to exercise reasonable care to warn of the dangerous risks associated with its use – causing cancers including multiple myeloma and blood cancer of the bone marrow and blood disorders which can be life- threatening, as admitted in the Company's recall notice.

**105.**

Valisure issued their Citizen Petition on Benzene in Body Sprays on November 3, 2021. In that Valisure report, the following information was provided: "benzene has long been directly associated with cancer in humans by epidemiological studies with persistent exposure as low as 0.8 ppm;" "The hematotoxicity of benzene has been described as early as 1897." "A study from 1939 on benzene stated 'exposure over a long period of time to any concentration of benzene greater than zero is not safe;" "There is probably no safe level of exposure to benzene, and all exposures constitute some risk in a linear, if not supralinear, and additive fashion;" Defendant, with this acquired information, knew or should have known of the evidence linking use of its products with benzene and multiple myeloma.  Despite this knowledge, Defendant failed to update the label on the product that it contained benzene.  Defendant also failed to update the Warning label on the product that it contained benzene and that benzene caused cancer.

**106.**

The dangerous propensities of benzene in the product was either known to Defendant or scientifically knowable to Defendant through appropriate research and testing by known methods at the time Defendant designed, distributed, supplied or sold the product.

**107.**

Defendant knew or should have known that the benzene contaminated product created significant risks of serious bodily harm to consumers, like Plaintiff, Arlene Foreman, and Defendant failed to adequately warn Arlene Foreman and/or these Plaintiffs, the reasonably foreseeable user, of the risks of using benzene contaminated deodorant. Defendant further knew or should have known in the post-approval and post-marketing phase that the warnings on the products were inadequate based on label warning requirements.

**108.**

Defendant knew or should have known, through post-marketing surveillance and otherwise, of the benzene defect in the antiperspirant aerosol deodorant product which caused Plaintiff's injuries, when used as intended. Defendant should have tested its finished antiperspirant aerosol deodorant product for the presence of benzene in its materials and withhold batches and or lots containing benzene, just as Defendant admitted was its normal safety process and protocols.

**109.**

The product was defective and not reasonably fit, suitable, or safe for its intended purpose because Defendant designed the product in a defective manner by using a defective, benzene laced propellant to spray the product out of the can and failed to give adequate warnings or instructions of benzene contamination at the time the product left Defendant's control and thereafter.

**110.**

Defendant failed to provide adequate warnings of the dangers regarding benzene in the product and that exposure to benzene can occur by inhalation, orally and through the skin and can result in cancers including blood cancer of the bone marrow and blood disorders, such as multiple myeloma, that can be life-threatening.

**111.**

The only "Warnings" listed on the Product's canister at the time of distribution are:

**A.      For external use only.**

**Flammable**

•    do not spray near flame or while smoking

•    contents under pressure

•    do not crush, puncture or incinerate

•    do not expose to heat or store at temperature above 120°F

**Do not use** on broken skin

**Ask a doctor before use if you have** kidney disease

**B.      When using this product**

•    keep away from face and mouth to avoid breathing it

•    avoid spraying in eyes

•    use only as directed; intentional misuse by deliberately concentrating and inhaling the contents can be harmful or fatal

**Stop use if** rash or irritation occurs

**Keep out of reach of children.** If swallowed, get medical help or contact a Poison Control Center right away.

**112.**

The failure to warn defects existed at the time the products left the Defendant's control.

**113.**

Defendant distributed and sold the product without sufficient warnings to notify Arlene Foreman and these Plaintiffs of the inherent danger in using the product that contained benzene, after acquiring knowledge of the carcinogenic effects to humans.

**114.**

Defendant knew that individuals who saw the direct-to-consumer advertising could not appreciate the risks of benzene exposure.

**115.**

Defendant knew or should have known that the minimal warnings disseminated with the product were inadequate, failed to communicate information on the dangers of benzene exposure in the products, and failed to communicate warnings that were appropriate and adequate to render the product safe for its ordinary, intended and reasonably foreseeable uses.

**116.**

Had Arlene Foreman been warned about benzene in the product, she would have used a safer alternative antiperspirant deodorant that would not have exposed Mrs. Foreman to benzene and would not have contracted multiple myeloma.

**117.**

The actual product Arlene Foreman used, identified as UPC code 037000711087, is one that was recalled by P&G, and is the same UPC code identified in Valisure's citizen's complaint to the FDA. Furthermore, the actual product Arlene Foreman used was tested by Valisure and

shown to have unacceptable toxicity levels of benzene, which proximately caused Arlene Foreman's injuries and damages. That product failed to include the aforementioned warnings.

**118.**

Plaintiffs' injuries, harms, losses, and damages were directly and proximately caused by the product, including the lack, insufficiency or adequacy of warnings of benzene exposure for which recovery is sought.

**119.**

Defendants had a duty to warn Plaintiffs of the benzene in the product during the time that Plaintiff, Arlene Foreman, was using the product, from approximately the 1980s through 2022. Defendant's breach of this duty proximately caused Mrs. Foreman's injuries and damages, described herein.

**D.  Defendant Breached an Express Warranty that the Product Did Not Contain Benzene.**

**120.**

For years prior to Arlene Foreman's diagnosis of multiple myeloma, Defendant affirmatively represented on its website that none of Defendant's products sold to consumers contained benzene.

**121.**

Based upon Defendant's affirmative statements regarding the safety of its products on its website, Arlene Foreman was induced to purchase and use the benzene tainted product for many years.

**122.**

Arlene Foreman's injuries and death were a direct result of her purchase and use of the benzene tainted product based upon the express warranties made by Defendant on its own website

showing that the product was safe to use and was free of cancer-causing ingredients, such as benzene.

**123.**

P&G sold their products with conscious disregard for the safety of users of the products and other persons who might be injured thereby.

**124.**

Plaintiffs further anticipate that expert testimony may be required and pray that all expert fees and expenses incurred by them be taxed as costs.

**125.**

Plaintiffs respectfully request trial by jury.

## Prayer for Relief

**WHEREFORE,** Plaintiffs demand judgment against Defendant for all damages sa stated herein, costs of suit, and pre- and post-judgment interest as provided by law and such other relief as the Court may deem equitable and just.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure, Plaintiffs demand a trial by jury of all claims in this Second Amended Complaint.

Dated: February 13, 2024

Respectfully submitted,

**DUDLEY DEBOSIER, PLC**

_____/s/ David M. Geerken_____
David M. Geerken (LSBA No. 31735)
622 Baronne Street
New Orleans, Louisiana 70113
Telephone: (504) 605-3806
Facsimile: (225) 239-7265
**COUNSEL FOR PLAINTIFFS**